WILLIAM G. SMITH AND MARY ANN SMITH, HIS WIFE, AP-PELLANTS, VS. WILLIAM HINES, ADMINISTRATOR OF THE ES-TATE OF CHARLTON HINES, APPELLEE.

1. The common law and statute fixing dower, by its own silent operation, raises a provision for the wife in the event of her surviving her husband, independent of, and without reference to, the agreement of the parties; consequently, the right of the wife to dower is not derived through the husband, but by provision of law. It is an interest which the law casts upon the wife.

2. Our statute having extended dower to *personal estate*, the wife has the same inchoate title in personal property that she has in real; excepting in personal estate, it is not provided she shall have it in that which the husband "had before conveyed," as in lands.

3. The husband cannot, by last will and testament, so bequeath his personal property as to deprive his widow of her right of dower therein; yet he may sell, or give his personal property away, even although it is with the avowed purpose of keeping his wife from getting her dower; but such sale or gift must be a *bona fide* one and be *perfected*.

4. If the conveyance or transfer by the husband be a mere device or contrivance by which the husband, *not parting with the absolute dominion over the property during his life*, seeks at his death to deny his widow her dower in his personal estate which the law would assign to her, then it is void and ineffectual against her.

5. Fraud is never presumed but always proved. Yet it is well established, that fraud may be *inferred* from facts and circumstances; from the character of the contract or from the condition and circumstances of the parties—such as whether the grantor keeps the bill of sale, or he retains *possession* of the goods or any part of them, and whether he parts with the absolute dominion over the property during life, and the use he seeks to make of it, &c.

Appeal from Leon Circuit Court.

This case was decided at Tallahassee.

A full statement of the case is contained in the opinion of the Court.

*Thos. Baltzell* for appellants.

*James Banks* and *M. W. Smith* for appellees.

FORWARD, J., delivered the opinion of the Court.

The bill in this case is presented by William G. Smith and his wife, Mary A. Smith, who was the widow of Charlton Hines, deceased, against William Hines, the administrator of said Charlton, claiming the share to which Mrs. Smith is entitled in the estate of her first husband, the said Charlton Hines.

It alleges that Charlton Hines died intestate, in the county of Columbia, in the State of Florida, on the —— day of —— 1856. That he left a large estate, consisting of land and personal property, estimated in value at $10,000, and that said William Hines obtained letters of administration upon his estate. That the said appellee, as administrator, took possession of the whole estate of said Charlton, dec'd, consisting of corn, cotton, fodder, household and kitchen furniture, notes, accounts, and other evidences of debt of the value of $2,165, as appears by the appraisement. That the said administrator sold and disposed of said property and converted the same into money, and collected said notes and other evidences of debt, amounting to $3,000 or other large sum, and has paid off the indebtedness of said estate, leaving a balance of $2,500 or other large sum.

That said Charlton Hines, in his life-time, and up to the time of his death, was possessed, in his own right and as his own property, of seven or more negro slaves, viz: Ailsey, a

woman, about thirty years of age; a woman, named Cathe-
rine, about twenty years of age, and her child, about three
years; a negro boy named John, about six years old, and a
boy named Jack, about twenty years old, and a negro wo-
man named Mary, about eighteen years old, and her child,
about two years old—of the value of $6,000. That, upon
the death of Charlton Hines, the said William Hines took
possession of said negroes, claiming them as his own. That
he refused to produce them to the appraisers as a part of the
estate of said Charlton Hines, as he should have done, but
holds the same and appropriates them to his own use. That
said slaves are rightfully the property of, and constitute a
part of the assets of the estate of, said Charlton Hines, sub-
ject to distribution among his legal heirs.

That the complainants intermarried on the —— day of
—— 1858, and are entitled to one-half of the estate of said
Charlton Hines, as the *dower* or distributive share of Mrs.
Smith, one of the complainants, who was the widow of said
Charlton Hines, deceased. That said administrator has re-
fused to settle with the complainants, and pay over to them
the portion of the estate to which they are entitled.

The prayer of the bill is for an account, decree, &c.

The answer of William Hines, the administrator, admits
that the complainant, Mrs. Smith, was the wife of Charlton
Hines. That said Charlton died about the time stated in
the bill. That W. G. Smith is the husband of said Mary A.
Smith. Also, that Charlton Hines was, at the time of his
death, seized and possessed of an estate consisting of forty
acres of land and sundry articles of furniture, corn, fodder,
stock, provisions and other articles, all of which, and their
appraised value, are exhibited in a schedule of appraisement
annexed to the bill of complaint and marked "Exhibit A."
That said exhibit "A" is a true, full and correct account of
all the personal estate and effects of said Charlton Hines at

the time of his death; he, therefore, denies that the said return is false and fraudulent in any part. That, as administrator, he proceeded to sell the personal effects of the said estate, and that the exhibit marked "B" is a true account of said sale. It denies that there was any greater amount realized from said sale than that set forth and stated in said exhibit.

The answer further avers that Charlton Hines was, in his life-time, seized and possessed of the negro slaves named and described in said bill, but a long time before his death—more than a year and a half—the said Charlton Hines sold and delivered the said negro slaves, and each and every one of them, to the defendant, for a valuable consideration, viz: the sum of $4,200, which sum of money was paid by the defendant to the said Charlton, as will appear by reference to the bill of sale annexed to the answer, marked "Exhibit C." That said slaves were then and there delivered to, and went into the actual possession of, said William Hines. That said slaves have, ever since the said sale and delivery, been in the possession and under the control of said appellee. It denies that said slaves, or any of them, were in the possession of Charlton Hines at the time of his death, or at any time since said sale and delivery, in his own right or as his own property, or in any other right, except when the same were loaned or hired to him, by the said appellee, for wages and hire, for the purpose of aiding him in his business.

The following is the testimony, all of which was read without objections, to wit:

THE DEPOSITION OF ARCHIBALD EVERITT.

Interrogatory 1st. Do you know the parties?
Ans. He knows the parties.
Interrogatory 2d. Were you or not indebted to William Hines, administrator of Charlton Hines, deceased, about the

8

year 1857, in two notes for about the sum of $800, the same having been originally given to Mathew Deas, and, by him, traded to Henry Stephens, and, by him, to Charlton Hines or his administrator? If so, when did you pay said notes, and to whom?

Ans. He paid William Hines, on notes, about six hundred dollars in or about 1857. Said Hines represented that the notes had fallen into his hands, as belonging to Charlton Hines, deceased. That said notes were originally given to Mathew Deas or bearer, but deponent cannot say as to their having been traded several times.

Interrogatory 3d. Did you pay them to William Hines, as administrator, or in his individual right? How did he represent himself as holding said notes?

Ans. William Hines, at the time of the payment of said notes, stated that he was attending to Charlton Hines' business.

Interrogatory 4th. Did you owe or were you indebted to said William Hines any other sums of money or account, about this time, in any other manner whatever?

Ans. He was not indebted to said William Hines, at the time, any other sums of money.

Interrogatory 5th. What has been the price paid in your county, and the surrounding counties, for the hire of slaves during the years 1857,–'8,–'9,–'60,–'61 and '62, both men and women, of different ages?

Ans. Slaves were hired in this county (Lowndes) for the years 1857,–'8,–'9,–'60 and '61, No. 1 hands at from one hundred and sixty-five dollars—women at from one hundred to one hundred and twenty dollars; slaves, the present year, (1862,) men at one hundred and fifty dollars, women eighty-five dollars.

Interrogatory 6th. Do you know anything further that will benefit complainants' cause? If so, state it.

Ans. He knows nothing further in favor of plaintiff.

Cross-Interrogatory. Whether William Hines, at any time, said he held those notes in his own right, and to state all he did say.

Ans. Says that he has answered the interrogatory in his answer to the second direct interrogatory.

Cross-Interrogatory. Whether he was acquainted with the names, ages and qualities of the negroes in controversy, and whether he was acquainted with the hires of negroes in Columbia or Hamilton county, Florida, during the years 1857, —'8,—'9,—'60,—'61,—'62?

Ans. He was not acquainted with the negroes in controversy, and that negroes hired for more in Hamilton county, Florida, during those years, so far as he was acquainted, than in the county aforesaid. Does not know about the hire of slaves in Columbia county.

The further deposition of the said Archibald Everitt, taken by leave of the Court:

To the question as to the age, place of residence and occupation of witness, he answers that he is 46 years of age—occupation, farming—residence, Lowndes county, Georgia.

2d Interrogatory. Whether he knows the parties, and whether he knew Charlton Hines in his life-time?

Ans. He knows the parties, and knew Charlton Hines in his life-time?

3d Interrogatory. Where did William and Charlton Hines reside in the year 1854, and in the month of July of that year?

Ans. William and Charlton Hines both were living in Lowndes county in July, 1854.

4th Interrogatory. Was William Hines in easy circumstances—able to command and raise the sum of $4,200 to buy negroes with, or was he in the habit of buying property at that time? What was his condition then?

264 SUPREME COURT.

Smith and wife vs. Wm. Hines, adm'r—Opinion of Court.

Ans. William Hines was apparently in very easy circumstances—had sold his farm for some cash—don't know how much—was in the habit of buying and selling property.

5th Interrogatory. Do you know of Charlton Hines'. selling to his father some eight or ten negroes in 1854? If so, state what you know of it—his design, purpose and object in such sale, and whether he paid for it by note, cash or otherwise, and whether the property was delivered or not before Charlton's death. State all you know fully.

Ans. He does not know positively as to such sale, but it was public rumor; and, also, that he intended to disinherit his wife entirely.

6th Interrogatory. Did Charlton Hines declare his purpose to cut off his wife from all share of his property, and make this sale with that view, and did his father know of such design?

Ans. He cannot answer this interrogatory.

7th Interrogatory. Did he leave his wife in Goorgia to move to Florida, taking his negro property with him, and did he or not leave her means of support?

Ans. He believes Charlton Hines took a part of his property, if not all, when he went to Florida, and left his wife in Georgia without any means.

8th Interrogatory. Do you know of a boy named John, a mulatto, owned by C. Hines? If so, state what you know of him—his birth, age, &c.

Ans. He does not know.

9th Interrogatory. Do you know anything further that will make for plaintiff?

[REMARK—There is no reply of record.]

1st Cross-Interrogatory. State whether, in 1854, William Hines was insolvent or in good circumstances. What was his estate worth at that time? Was his credit good? Could he borrow money or not?

Ans. Says he has answered this in his answer to the 4th direct interrogatory.

2d Cross-Interrogatory. Whether do you know that the note of Archibald Everitt was held by William Hines, and whether he did not give said note in part payment of the said negroes?

Ans. He does not know.

3d Cross-Interrogatory. If you answer that Charlton Hines declared his purpose to cut off his wife from all share of his property, state what reason he assigned for so saying?

Ans. He does not know, only from general rumor.

4th Cross-Interrogatory. If he left his wife in Georgia, state for what reason, and also the reason he assigned?

Ans. He does not know, of his own knowledge, of any reason.

Martin Douglass and Alsey, his wife:

1st Interrogatory. What is your age, place of residence and occupation?

Ans. Martin Douglass says he is 46 years, and Alsey Douglass 45 years—occupation, farming.

2d Interrogatory. Do you know the parties, and did you know Charlton Hines in his life-time?

Ans. They knew the parties, and knew Charlton Hines in his life-time.

3d Interrogatory. Where did William and Charlton Hines reside in the year 1854, and in July of that year?

Ans. They resided in Lowndes county, Georgia, about July, 1854.

4th Interrogatory. Was William Hines in easy circumstances—able to command and raise the sum of $4,200 to buy negroes with, or was he in the habit of buying property at that time? What was his condition at that time?

Ans. He was in the habit of trading, buying and selling property, but do not know as to his cash means.

5th Interrogatory. Do you know of Charlton Hines selling to his father some eight or ten negroes in 1854? If so, state what you know of it—his design, purpose and object in such sale, and whether he paid for it by cash, note or otherwise, and whether the property was delivered or not before Charlton's death? State all you know fully.

Ans. They say they do not know of such sale, or any delivery of the negro property.

6th Interrogatory. Did Charlton declare his purpose to cut off his wife from all share of his property, and make this sale with that view? and did his father know of such design?

Ans. They do not know the object of Charlton Hines in making any pretended sale of his negroes.

7th Interrogatory. Did he leave his wife in Georgia and move to Florida, taking his negro property with him, and did he or not leave her means of support?

Ans. Charlton Hines left his wife in Georgia, when he went to Florida, without any support, and we believe carried his negroes to Florida.

8th Interrogatory. Do you know anything of a boy named John, a mulatto boy, owned by C. Hines? If so, state what you know of him—his birth, age, &c.

Ans. They lived at Charlton Hines' at the birth of a mulatto boy, his mother was called Catherine—which was about 1853—but we cannot say as to his name.

1st Cross-Interrogatory. State whether, in 1854, William Hines was insolvent or in good circumstances? What was his estate worth at that time? Was his credit good? Could he borrow money or not?

Ans. In 1854, he was apparently in easy circumstances, credit good, but cannot say as to the value of his estate.

2d Cross-Interrogatory. State whether you do not know that the note of Archibald Everitt was held by William

Hines, and whether he did not give said note in part payment of said negroes?

Ans. They do not know anything.

3d Cross-Interrogatory. If you answer that Charlton Hines declared his purpose to cut off his wife from all share of his property, state what reason he assigned for so saying?

Ans. They do not know as to Charlton Hines' objects in making any sort of disposition of his property, only from common rumor.

. C. L. Carruth says:

He knew Charlton Hines; he lived in Columbia county; lived neighbor to him; came into Columbia county, witness thinks, in the winter of 1855, and died in said county sometime in the year 1856. Said Hines lived with his father a short time, but *at the time of his death he was living to himself.* Charlton Hines *had some negro slaves that lived with him until his death.* Remembers the names of Jack, a negro man, about grown, a very good negro—Mary, a woman, and Catherine, a woman. Said slaves remained in the possession of said Charlton Hines up to the period of his death, to the best of witness' knowledge. Witness supposes said Hines to be worth as follows: The boy Jack was worth about one thousand dollars, and the women Mary and Catherine were worth eight hundred dollars each. Witness states, by way of explanation, that William Hines, the defendant, lived on Charlton Hines' place a short time, but moved to himself.

On cross-examination, said witness testifies as follows:

Witness does not know anything in reference to the titles of said Charlton Hines to said slaves. Said Charlton Hines died at his father's house.

Daniel Keith says:

He knew Charlton Hines; lived neighbor to him; said Hines came into Columbia county in 1855, and died. Wit-

ness thinks said Hines died in 1856. Said Hines had some negro slaves *in his possession.* Witness remembers the names of Jack, a man, Catherine, and her son John, a boy about two years old; Mary, a woman, and Elsey, a woman —*all of which said slaves remained in the possession of said Charlton Hines up to the period of his death.* Witness values said slaves as follows: The man Jack was worth from eight hundred to one thousand dollars, the woman Catherine was worth eight hundred dollars, her son John was worth two hundred dollars, Mary was worth seven hundred dollars, and the woman Elsey was worth seven hundred or eight hundred dollars. Witness never heard that said slaves were not the property of Charlton Hines, until since his death; he heard since that they were not his negroes.

On his cross-examination, said witness answers as follows:

Witness does not know anything in reference to the titles of said Charlton Hines to the said slaves or to the land. Said Charlton Hines died at his father's house.

James S. Hackney says:

He knew Charlton Hines; first knew him in 1855; knew him up to the time of his death. Said Hines had some negro slaves *in his possession,* and witness hired one of said slaves from the said Hines—a man named John, sometimes called Jack, and a negro woman called Catherine, and a woman named Mary, were in the possession of said Hines. Witness values said slaves as follows: John or Jack was worth a thousand dollars, and the woman Catherine was worth about nine hundred dollars, and the woman Mary about nine hundred dollars. Witness knew another woman named *Olivia,* which said woman witness purchased of said Charlton Hines; was to give nine hundred and twenty-five dollars for said woman, and did pay said amount, as follows: two hundred to Charlton Hines and seven hundred and twenty-five dollars to William Hines, as administrator of said Charlton Hines.

On his cross-examination, says:

· He knows nothing in reference to the title of said Charlton Hines to said slaves, or to the land on which he resided.

A. J. Smiley says:

He knew Charlton Hines and William Hines; knew these negroes—Jack, Catherine, and a little child, name unknown, child of Catherine—were in the possession and under the control of Charlton Hines; knew them to be in his possession more than a year prior to Charlton Hines' death; were in his possession a short time before his death. ·

Cross-examined. Does not know that said negroes were in Charlton Hines' possession at the time of his death; does not know that they were the negroes of Charlton Hines. Charlton Hines and William Hines lived three-quarters of a mile distant from each other.

Joseph K. Haddock says:

That he thinks it was in the spring of the year 1855, he and Mr. Frink hired two slaves from Charlton Hines, dec'd—they were women; he had them but a few days, and does not remember their names distinctly, but thinks one was named Mary—the younger one of the two, about 18 or 20 years of age, and called the other woman mother; that he paid the hire of said slaves to Charlton Hines, dec'd, who hired said slaves to him and Mr. Frink for one year, but, soon after, said he had made arrangements to make a crop himself, and wanted his negroes to do it over the river. William Hines, the defendant, never called on him for the hire of said slaves. That Charlton Hines sold a yellow girl, named *Olivia*, to one James S. Hackney; does not remember when said sale took place.

On his cross-examination, says he does not know that said slaves belonged to Charlton Hines.

Henry M. Stephens says:

He purchased a yellow woman named Jane, and her child

9

Amanda, from William Hines, some time in November, 1854; that Charlton Hines told him, witness, that he had made a very good bargain; that he, Charlton Hines, had owned said slaves, but had sold them to William Hines. Does not remember the precise language used.

Re-examined. States that his notes, for the purchase money for said slaves, came back to him on two occasions—once in the hands of Charlton Hines, to whom he made a payment in a note on Archibald Everitt, and once in the hands of John W. Hines, to whom he also made a payment in a draft and some money.

Cross-examination resumed. Witness says that he believes that he made both payments to Charlton Hines and John W. Hines, as the agents of William Hines; that the notes were made payable to William Hines, or such is his impression at this time.

William J. Duncan says:

He knew Charlton Hines, and recollects he, Charlton Hines, had possession of some negroes in Hamilton county, in the winter of 1854. Recollects the name of one, her name was Mary; thinks there were three or four; recollects there were three women. He hired one of said slaves and kept her about three weeks, and Charlton Hines asked him to let him off, which he did; paid Charlton Hines the hire for said slaves.

On cross-examination, says he does not know that said slaves belonged to said Charlton Hines.

Alexander Purviance says:

He knew Charlton Hines. As well as he can recollect, it was either in the winter of 1854, or spring of 1855, that Mr. Hines was here with some negroes; does not recollect precisely, but thinks that Charlton Hines had three women; recollects the name of only one, her name was Catherine; recollects that Charlton Hines offered to sell these negroes

to Joseph K. Haddock—meaning, as he supposes, all three of said negroes—but Mr. Haddock did not wish to buy them. Thinks that, in the year 1854, Charlton Hines sold a yellow girl named Olivia to Dr. Hackney.

On his cross-examination, says he does not know that said slaves belonged to Charlton Hines.

John J. Underwood says:

That, some time in the year 1854, he saw a negro girl here in the possession of Charlton Hines, and in the possession of Dr. Hackney, who, he thinks, purchased said girl, in the summer of 1854, from Charlton Hines. Believes it to be the same girl alluded to by the other witnesses in this cause. Thinks that, towards the close of the year 1854, he saw another negro girl in the possession of Charlton Hines, and thinks her name was Catherine.

On cross-examination, says that he does not know said slaves belonged to Charlton Hines from any other facts than those disclosed already.

Henry J. Stewart says:

That, some time in the spring or summer of 1854, Charlton Hines came to witness to relate some difficulties between himself and his wife, and thinks that Charlton Hines stated that there were difficulties between himself and wife and that they had separated. Believes this conversation took place *previous* to July, 1854; and in speaking of his prospect of getting a divorce in Florida, he intimated that he did *not wish his wife to receive any benefit from anything he had*, on account of her conduct towards him. Thinks he saw said Hines again in October, and that he told witness that his place was sickly on the Suwannee, and wanted a place close to Jasper for the purpose of keeping his negroes on it, and if he liked such place he would rent it for the next year. Witness told Hines of such place, who removed upon it; but, being dissatisfied, said Hines spoke to witness and

wished to board with him—said he had negroes and wished to board with him; said he had negroes and wished to live like a white man. That after said Hines concluded to board with witness, said that he had some negroes that were doing nothing—proposed to hire his negroes to witness, which witness agreed to do, and did hire two, a negro man and a negro woman; the negro fellow was about 20 or 22 years of age, named Jack, and negro woman 24 or 25 years old, named Catherine. Witness kept said slaves a week or two. Said *Hines had other negroes in his possession.* Heard said Hines say that Catherine had a child up in Georgia that belonged to him. Said Hines took said slaves away from here to Columbia county, to his place, as Hines stated.

On cross-examination, says that he does not know any other fact touching the title or ownership to said slaves.

### TESTIMONY OF THE APPELLEE.

Benjamin Tompkins says:

He knows all the parties; knew the negroes conveyed by Charlton Hines to his brother William Hines. The oldest negro named Ailsey, Catherine was the next oldest, Jane was the next, Jack next, Mary next; that was all, but the two children—John was Catherine's child, Amanda was Jane's child. Catherine did not have more than one child at the time Charlton Hines sold them to William Hines. The boy was named John, yellow complexion, aged about ——year, at the time of said sale. Says he lived near them and worked in the families of both for many years, and this is the way he came in possession of this knowledge.

Cyprian Brinson says:

I know all the parties. I knew the boy John, mentioned in the bill of sale, as Joe, the only child Catherine had at the time of the sale. I saw the child at Charlton Hines', when the boy was about two or three months old; he was

what I called a dark mulatto, and was told by Charlton Hines that, the boy was Catherine's child. At the time of Charlton Hines' death, Catherine was pregnant and soon afterwards had a child. The negroes named in the bill of sale were *all* the negroes that Charlton Hines owned at the time of the execution of said bill of sale, and that he owned no more negroes from that time until his death.

James C. A. Polk says, in answer to Interrogatory 1st:

I was acquainted with William Hines, but am not acquainted with William Smith and wife.

2d Interrogatory. State whether you ever had a conversation with Charlton Hines about negroes now in possession of William Hines, and what he said about these negroes belonging to him or his father?

Ans. I think it was about 1856, if I recollect right, I was hauling cotton for Mr. Charlton Hines to gin; he invited me to his house to dinner; he wanted to purchase a horse of me; I offered to sell the horse to him on a credit; he replied that he had too much respect for me, that he didn't want to cheat me; I replied it was strange that he couldn't buy, as he had several negroes; his reply was that he had sold them to his father.

3d Interrogatory. Are you acquainted with these negroes? What would each or all of them hire for per year?

Ans. I am unable to say what they would hire for, as there were several children among them. I would not have given more than $75 a piece per annum. I think there was one negro man, two women and three children.

Cross-examination. Mr. Charlton Hines was then living in Columbia county, near Suwannee; he was living some twenty miles from his father's; I think his father was living in Georgia; Mr. Charlton Hines was a-farming, he had no store; I hauled my cotton to his gin-house; I had six bales of cotton ginned; Mr. Charlton Hines made a crop of that

year on that place; the place of Mr. Charlton Hines was some six or seven miles from the Suwannee river. The time that I carried my cotton to be ginned at the gin-house of Mr. Charlton Hines, was the latter part of the fall or winter. Mr. Charlton Hines told me that he gave $150 for the improvements; he ginned with a mare and mule, I think. Judge Hines moved to a place adjoining Charlton Hines, and not to Charlton's. I lived about eight miles from Mr. Charlton Hines'. The place from Mr. Carruth, I think, was three miles from Charlton Hines'. I am not related to Mr. Charlton Hines.

C. Brinson says:

I am related to Mr. William Hines, the defendant, by marrying his daughter; am not related to Mrs. Smith, (except she being the wife of Charlton Hines.) I think that I never heard any conversation with Charlton Hines in regard to the negroes. Charlton told me that his wife married him for the sake of his negroes—that she had ruined him by her separation from him, and that he be damned if she should have any of them. I was acquainted with the family; there were four negroes, viz: Jack, Elsey, Mary, Catherine—and three of them were worth $75 each, per year, and one worth $60.

W. M. Ives says:

I am well acquainted with the hand-writing of John W. Hines, the subscribing witness to the bill of sale produced, marked "Exhibit C," and am satisfied, from my knowledge of his hand-writing, that he signed the same.

### TESTIMONY OF MATHEW M. CASWELL.

1st Interrogatory. Are you acquainted with the parties to this suit?

Ans. I am acquainted with the parties.

2d Interrogatory. Are you or are you not acquainted

with the hand-writing of Charlton Hines and J. W. Hines?

Ans. I am tolerably well acquainted with the hand-writing of Charlton Hines, but not with that of John W. Hines.

3d Interrogatory. State what means you have had of becoming acquainted with their hand-writing?

Ans. From sitting with Charlton Hines, as Magistrate, and seeing him write frequently.

4th Interrogatory. Look upon the paper writing marked "Exhibit C," purporting to be a bill of sale from Charlton Hines to William Hines. State, if you know, in whose hand-writing the body of the instrument is, and in whose hand-writing, if you know, the signature of the maker and witness is?

Ans. I believe the body of the instrument and signature to be that of Charlton Hines, but am not acquainted with the signature of John W. Hines.

5th Interrogatory. If you say the body of the instrument is, and the signature is, in the hand-writing of Charlton Hines, as maker, and J. W. Hines, as witness, state whether you have any doubt about it?

Ans. I have no doubt about the signature of Charlton Hines.

6th Interrogatory. Look upon the book marked "A," and state what it is?

Ans. I call the book a Justice's Court docket.

7th Interrogatory. Look upon the book, from pages 2 to 10, inclusive, and say in whose hand-writing is the signature purporting to be that of Charlton Hines?

Ans. I have examined the book marked "A," and am pretty well certain that it is the hand-writing of Charlton Hines.

8th Interrogatory. State what means you had of know-

ing the said signature of Charlton to be the signature of Charlton Hines?

Ans. I have already stated that I sat with him, as Magistrate, and saw him frequently write at such times.

9th Interrogatory. Look upon the paper writing marked "B," and say in whose hand-writing is the signature purporting to be that of Charlton Hines?

Ans. It looks like the hand-writing of Charlton Hines.

10th Interrogatory. State what means you have of knowing said signature to be in the hand-writing of Charlton Hines?

Ans. From being well acquainted with his hand-writing.

11th Interrogatory. State whether you have any doubt as to whether said signature is genuine or not?

Ans. Have no doubt about it.

THE ANSWER OF CYPRIAN T. BRINSON TO THE ABOVE INTERROGATORIES, PROPOUNDED TO HIM AS WELL AS SAID CASWELL.

To the 1st Interrogatory : He answers he does.

To the 2d Interrogatory : He answers he is.

To the 3d Interrogatory : He answers, I have been with them more or less ever since the year 1834, and been familiar with them and with their transactions up to the time of their death.

To the 4th Interrogatory : He answers that he has examined the paper marked "B," and that he has no doubt but that the body of the instrument and signature is the hand-writing of Charlton Hines, and that the signature of John W. Hines, as one of the subscribing witnesses, is genuine.

To the 5th Interrogatory : He answers, that he has no doubt as to the genuineness of the signatures of persons referred to—Charlton Hines and John W. Hines.

To the 6th Interrogatory : He answers, he has examined

the book marked "Exhibit A," and says it seems to be a Magistrate's docket.

To the 7th Interrogatory: He answers, he has no doubt that the signature, purporting to be that of Charlton Hines, is genuine.

To the 8th Interrogatory: He answers, by being with him while holding his Courts as Magistrate.

To the 9th Interrogatory: He answers, he has looked at the paper marked "Exhibit B," and knows it to be the hand-writing of Charlton Hines.

To the 10th Interrogatory: He answers, from being intimate with him and well acquainted with his hand-writing from a school-boy to the time of his death.

To the 11th Interrogatory: He answers, he has no doubt of its genuineness.

To the Cross-Interrogatory: He answers, I know it from seeing them write repeatedly from the year 1834 up to the time of their death.

The testimony of James M. Clyatt and H. Graham, in answer to the above interrogatories, is about the same as that of Cyprian Brinson and Caswell thereto.

The bill of sale, referred to, was read in evidence without objection, and reads as follows, viz:

"Know all men by these presents, that I, Charlton Hines, have, for and in consideration of the sum of forty-two hundred dollars, paid to me in hand, this day sold to William Hines the following named negro slaves: Alse, a woman, aged thirty years; Mary, a girl, thirteen years; Jane, seventeen years old, a mulatto, and her child Manda, yellow complexion, of one year old; Catherine, a woman, twenty years of age, and her boy Joe, a mulatto, of one year old; Jackson, a boy, sixteen years of age. All of the above named slaves I warrant sound in mind and body, and slaves for life, and the right and title thereof.

"Given under my hand and seal this 13th day of July, 1854.                    CHARLTON HINES.  [L. S.]

"In presence of: J. W. Hines."

The complainants read, in evidence, without objection, the account of William Hines, adm'r, with estate of Charlton Hines, for the year 1856, in which the only item bearing upon the questions in this cause, are two sums of money credited as received from Archibald Everitt—one for $200, the other for $313.13.

On the 6th day of February, in the year 1863, the following decree was rendered by the Honorable the Judge of the Circuit Court of Leon county, to wit:

"On this day, this cause came on to be heard upon the bill, answer, replication, Master's report, exhibits and proofs, and was argued by the solicitors of the respective parties.

"Whereupon, on consideration, the Court doth adjudge, order and decree as follows: That defendant, William Hines, administrator of Charlton Hines, deceased, pay to the complainants, in right of Mary Ann Smith, who was the widow of Charlton Hines, deceased, the sum of sixteen hundred and three dollars and eighty-two cents, that being one-half in value of the personal estate of said Charlton Hines, deceased, exclusive of slaves, and it being the amount to which Mrs. Smith is entitled, as the widow of said Charlton Hines, as will appear by reference to the report of the special Master, William E. Danelly, whose report was confirmed by a previous order of this Court, passed on the 8th January, 1863.

"It is further adjudged, ordered and decreed that the slaves named and described in the bill of sale from Charlton Hines to William Hines, bearing date the 13th July, 1854—viz: Alse, a woman, aged thirty years; Mary, a girl, thirteen years; Jane, seventeen years old, a mulatto, and her child Manda, yellow complexion, of one year old; Catherine, a woman, twenty years of age, and her boy Joe, a mulatto, of

one year old; Jackson, a boy sixteen years of age—were, in the life-time of Charlton Hines, the absolute property of William Hines, the defendant, and are not assets of the estate of Charlton Hines, deceased, subject to distribution.

"It is further adjudged, ordered and decreed that the slaves Jack and John belong to the estate of Charlton Hines, deceased, and that they, together with their hires since the death of said Charlton Hines, constitute a part of the assets of said Charlton Hines' estate, subject to distribution.

"It is further adjudged, ordered and decreed that the slaves Jack and John be divided between Mrs. Mary Ann Smith and the other distributees of Charlton Hines, deceased, to be distributed among his heirs and distributees.

"It is further adjudged, ordered and decreed that the said William Hines render an account of the hire of the slaves Jack and John before William E. Danelly, Esq., Master in Chancery, and that he pay over to the complainants, in right of Mrs. Smith, the half of the amount which may be reported to be due. In taking said account, the said Master is instructed to allow, as a credit, sums of money paid out by defendant for taxes and physicians' bills for and on account of said slaves.

"It is further adjudged, ordered and decreed that Silas L. Niblack, Esq., be and he is hereby appointed commissioner to divide the slaves Jack and John among the persons above mentioned, and in the manner above directed.

"It is further adjudged, ordered and decreed that the Master, William E. Danelly, Esq., do inquire, and state to the Court, in writing, whether the complainant, William G. Smith, has made any settlement or provision for the complainant, Mary Ann Smith, his wife, and the issue of their marriage, or entered into any agreement for that purpose. And, in case the Master shall find that he has not, that said

Master report and nominate a suitable person to act as trustee in any settlement which the Court may make.

"It is further adjudged, ordered and decreed that William E. Danelly, Master in Chancery, and Silas L. Niblack, commissioner, report, without necessary delay, their acts, under this decree, to the Court."

From this decree, appeal is taken to this Court.

The petition of appeal sets forth the following grounds of error in said decree, to wit:

1st. That said Court did not award to the widow and to complainants an interest in the negroes pretended to have been conveyed by bill of sale to Hines, to the interest of one-half.

2d. In not declaring said bill of sale fraudulent and void.

3d. The Court should have given interest from the date of the Master's report, and not from the decree.

It is claimed on the part of the appellants, who were the complainants below, that the evidence adduced by the said widow and her husband establishes the fact to be, as alleged in their bill of complaint, that said Charlton Hines died leaving, as part of his personal estate, nine negro slaves— to wit: Ailsey; Catherine, and her child Joe, about three years old; John, a negro boy, about six years old; Jack, a boy, about twenty years old; Mary, and her child about two years old, and John and Jack; exclusive of Jane and her child Amanda, sold to Henry M. Stephens in November, 1854—in which she is, under the statute of this State, entitled to have dower set apart to her.

The administrator of the estate of said Charlton Hines insists that the bill of sale from Charlton Hines to him (William Hines) passes and conveys to him a clear and perfect title to the slaves therein named and described, and that said Charlton Hines did not own any slaves at the time of his death—not even "Jack" and "John," as so decreed by

the Chancellor in the Court below. That Charlton Hines, in his life-time, having divested himself of all right, title and interest in and to said slaves, his widow, at his death, could not claim a share of them as a part of his estate.

In response to which, it is contended by the solicitor for the widow, that said pretended bill of sale is all a sham and pretence, executed with the specific intent to defraud her. That, in point of fact, it was never delivered to the said William Hines by the said Charlton Hines, in his life-time. That said slaves were never sold by said Charlton Hines to said William Hines, as pretended in said bill of sale; nor were said slaves ever delivered to said William Hines, nor in the possession of the said William Hines, until after the death of said Charlton Hines, when he became possessed of them as administrator; and that her husband, the said Charlton Hines, died *possessed* of them.

In answer to this, it is contended by the solicitors for the said William Hines, that the wife had no vested interest in the personal property of her husband during his life-time, and therefore cannot be heard in a Court of Equity, in any attempt to impeach a sale or gift of personal property made by the husband in his life-time, even though there was an avowed and specific intent to defeat the claim of the wife to dower.

The first question presented is, whether the widow of Charlton Hines can set up, in a Court of Equity, that the sale of said negroes was not in fact perfected?

2d, Whether she had an *interest*, at the time said bill of sale was signed, sufficient to authorize her to set up the fraud?

This brings us to consider the matrimonial contract and law of dower in this State; and, first, the matrimonial contract, so far as relates to the question before the Court. What is it?

282      SUPREME COURT.

Trustees Int. Imp. Fund vs. Wm. Bailey—Opinion of Court.

In Banks vs. Sutton, 2 Peer William, 634, Sir Joseph Jeykell contended that dower arose *ex contractu*. This opinion of Sir Joseph entered the list of judicial decisions for some time, and finally, says Mr. Park in his valuable treatise on dower, became settled as follows, and which is now the settled law in England and America:

"Strictly speaking, the engagement between the parties is nothing more than a contract to enter into the respective relations of matrimonial union, and *the law*, contemplating the consequences of that contract, by its own silent operation raises a provision for the wife in the event of her surviving, independent of, and without reference to, the agreement of the parties. It may indeed be said, that allowing the right of dower does not enter into the essence of the original contract; yet, the general understanding that the wife should be so provided for by force of the marriage ordinance, does in fact form a basis of the contract, and, as such, *a matter of equitable support*."—Park on Dower, 132.

So it is the opinion of this Court, that in this State the *law*—that is to say, the common law and statute—by its own silent operation, raises a provision for the wife in the event of her surviving her husband, independent of, and without reference to, the agreement of the parties; consequently, the right of the wife to dower is not derived *through the husband*, but by provision of law. It is an interest which the law casts upon the wife.

"Dower," says Kent, "is a title inchoate, and not consummate until the death of the husband, but it is an interest which attaches on the land as soon as there is the concurrence of marriage and seizen."—4 Kent, 50. It may be compared to a life-estate vested in one person, to take effect only in case he survives another. The right to enjoy the estate is but a possibility. He may and he may not survive. If he does survive, the right becomes perfect.

A right to dower is an interest contingent during the life of the husband, but rendered absolute by his death. Now, our statute having extended dower to *personal estate*, she has the same inchoate estate in personal property that she has in real, excepting, in personal estate, it is not provided she shall have it in that which he "*had before conveyed,*" as in lands; but, in the 3d section, providing the manner of proceeding to have dower set apart, it is stated that the sheriff and commissioners "shall also, at the same time, allot and set off to such widow her portion of the personal estate of which her husband *died possessed.*" From this view, it follows that the right of dower in personal property, in this State, is an inchoate interest, contingent during the life of the husband, but rendered absolute by his death. The right is of a double contingency, viz: he may, before death, sell or give it away, and she may not survive him.

If we are correct in our definition of the interest of the wife, by way of dower in personal property, it seems clear that the question, whether her husband has or has not *bona fide* conveyed or sold his personal property, is one that she can contest—certainly as much as the widow can, in those States where dower in lands is only given in those lands of which the husband shall die *seized and possessed.* In the latter, the books are full of decisions that the widow may contest whether her husband has, in his life-time, *bona fide* conveyed.

Again. The statute of Florida provides, that "When any person shall die intestate, or shall make his last will and testament, and not therein make any express provision for his wife, by giving and devising unto her such part or parcel of real and personal estate as shall be fully satisfactory to her, such widow may signify her dissent thereto, &c., &c., &c., at any time within one year after the probate of such will; and then, and in that case, she shall be entitled to

dower in the following manner, to wit: one-third part of all the lands, tenements and hereditaments, of which her husband died seized and possessed, or had *before conveyed*, whereof said widow had not relinquished her right of dower, as heretofore provided by law, which third part shall be and inure to her proper use and behoof in and during the term of her natural life, &c.

"Sec. 2. When a husband shall die intestate, or shall make his last will and testament, and not make provision therein for his wife, as expressed in the first section of this act, she shall be entitled to a share in the personal estate in the following manner, to wit: if there be no children, or if there be but one child, in that case she shall be entitled to one-half; but if there be more than one child, in that case she shall be entitled to one-third part in fee simple, except slaves, in which she shall have a life estate, *and such claim shall have preference over all others.*"

The late Court of Appeals, in the case of Ellis and wife vs. C. Parish, widow, &c., in giving construction to this act, laid down and decided: "That. 'dower' means not only the common law provisions of a life-estate in one-third of the real estate, but *also* the other provision secured by that act, viz: an interest in slaves and other personal property." In this opinion we concur.

Thus it will be seen that, under our statute, the right of dower or dower *interest* of the widow, in the personal estate of her husband, are *preferred* rights—her claim stands higher than that of a creditor. If, then, the widow has a right to dower, which is cast upon her by the law, and if that right is a preferred one—one that stands above all other claims, even higher than creditors—we ask, does she derive this right through her husband, the intestate, as in the case of an heir or administrator? We think not. It seems to us her claim is antagonistical to the estate of her husband—she

had a contingent lien before his death. The principle under which an heir or administrator cannot set up title against voluntary deed of ancestor, is because the administrator stands in the place of the intestate, and has no greater or other rights than the person he represents, and the heir derives through the ancestor and has no greater or other right than the ancestor, and, in both cases, they had no inchoate title before his death. The ancestor could not avoid a gift made by covin and fraud, although under the statute of 13 Eliz., which we have enacted in this State, it would be void as to creditors—so cannot the heir or administrator, because they represent the ancestor, and because they had not, in his life-time, even an inchoate interest. But, it may be asked, does not the widow, like the heir, get her share out of the personal property left by the husband? The answer is, that although, like the heir, she takes it out of the estate left by the husband, yet, unlike the heir, she cannot have her claim defeated by last will and testament, nor does she receive it under the law of descent and distribution. No doubt any *bona fide* sale or gift of personal property, made by the husband in his life-time, would affect the wife's claim for dower, as it would be binding upon the heir. We do not wish to be understood as intimating or asserting that the husband is restricted by any claim which the law casts upon the wife as dower, from making sale or gift of his personal property during his life-time, providing it is not done by will; but we do hold that such sale or gift must be a *bona fide* one—not a sham or pretence of sale or gift—and one which the husband cannot take back, and is not to take effect, in case some specified event does not happen.

· The policy of this country is not to restrict the right of the owner to sell or give away his personal property; and while we think the husband cannot, by last will and testament, so bequeath his personal property as to deprive his widow of

11

her right of dower therein, yet he may sell or give his personal property away, even although it is with the avowed purpose of keeping his wife from getting her dower therein, but uch sale or gift must be a *bona fide* one, and be perfected.

If we are correct in our position as to the operation of our statute regulating dower in personal property, and that the widow had an inchoate title to such personal property as the husband might die *possessed* of, it seems to us the question, whether the husband did, in point of fact, die possessed of such property, or whether he had or not *bona fide* sold or given the same away in his life-time, are questions which her *interest*, made perfect by his death, will warrant her standing in equity, so that she may contest the same—even although a written bill of sale may be involved.

In the case of Hughes, lessee, vs. Bazel Shaw, Martin and Yerger's Reports, page 327, the Court say:

"It does not require argument to prove that a man, who is at once husband and debtor, may at the same moment intend, and by the same act consummate, an alienation of his property, which, in the eye of the law, is equally a fraud against the wife and the creditor. It is no less clear that the same circumstances which prove a fraud upon one, may often conduce to show fraud also against the other. If a man, married and deeply in debt, make a conveyance of all his estate to his son, no one will deny that this evidences a fraud as against his creditors. Is it not as obviously a fraud also against his wife? She is entitled by law to one-third of all the lands, &c., of which the husband died seized or possessed; and he is not at liberty to deprive himself of the seizen or possession, at the time of his death, with intent to defeat her of her dower, by conveyance fraudulently made to children or otherwise."

It is true that the statute of Tennessee provides, by proviso, "*That any conveyance made fraudulently to children*

or otherwise, with an intention to defeat the widow of her dower hereby allotted, shall be held and deemed to be void," &c. This proviso does not affect the remarks of the Court above quoted, because it is only an abridgement or alteration of the law of dower in that State. Under this proviso, the right of the wife to dower in such lands as her husband, during his life, has bona fide conveyed, without intention to defeat his widow of her dower, is taken away. In that case the question was, whether the ostensible object, which was to defeat *creditors*, deprived her of her dower. That Court, in construing the statute, say it did not.

Again. That Court say, in speaking of the policy of the said act of Tennessee, " But it is difficult to see how liberal and enlightened views of the public good could sanction the right of a husband to dispose of his real estate to his children, to the prejudice of that proportional share which the law has designated for the wife."

In Ford vs. Ford et al., 4 Ala., (New Series) page 145, the Court remark: " Whilst it is admitted that the husband might have made a perfect gift during his life of all his personal property, and thus have prevented his wife from receiving any portion of it under the statute of distributions, it is insisted that such gift must be complete, and that in this case the reservation of a thousand dollars a year during the life of the grantor, shows that the gift was not *bona fide*, but merely intended to defeat the rights of the complainant."

In Vermont, where the widow is only entitled to dower in such lands as the husband may die *seized and possessed*, it was held, in Ladd vs. Ladd, 14 Vermont, 185, that where a husband, in consideration of one dollar, and of love and affection, conveyed lands, of which he was seized, to his brother, and delivered the deed to a third person, to be by him kept until after the grantor's death, and then to be delivered to the grantee, which was done, and the grantor re-

tained possession of the lands during his life, it was held that such deed did not operate to convey the lands so as to deprive the widow of her dower.

So in the case of Thayer vs. Thayer, 14 Vt., 107, which was a conveyance of personal as well as real estate—the deed secured to the grantor possession, use and control of it during his life. The Court held it fraudulent, as against the claims of the wife's dower.

The facts, in the case of Davis vs. Davis, 5 Missouri, were as follows:

Davis died, leaving a widow and one son. A short time previous to his death, he made a will, leaving all his estate, real and personal, to his son, except so much as would be sufficient to support his wife. On the same day, he, by *deed*, conveyed to his son *five slaves*, the most valuable part of his estate. On the death of Davis, his widow renounced the will and claimed her dower, not only in the real estate, but *in the slaves* conveyed in the deed. The Court say: "The bill charges that the deed is a will in disguise. I think it so. The authorities abundantly satisfy me that such things are fraudulent as to the dower, and therefore void." One of the Judges (Tompkins) dissented from the decision of the Court.

In Pennsylvania, it was held, in Killinger vs. Reidenhaner, 6 Sergeant and Rawles, 531, that a mortgage given by the husband for the purpose of defeating the wife's dower, was not good as against her claim.

In Maryland, the case of Griffith vs. Griffith's Executors, was a case where the intestate willed away all his personal estate, and left nothing to his wife. The question was, whether she was entitled to a third part of the personal estate, clear of debts. The Court held that she was. The decision of this case was under the common law of England, and statutes of Maryland adopting the common law, under

the general opinion in that State, existing at the time the Legislature adopted the common law; that the wife was entitled to a third part of the personal estate by the common law.

The case of Coomes et al. vs. Clements, 4 Harris and Johnson, 481, is another case, where the husband had willed away his personal property. The Court held the widow entitled to her share.

In the case of Jenny vs. Jenny, 24 Vermont, page 324, the wife alleged in her bill that her husband had conveyed all his property to the defendant, with a view to defeat the plaintiff of her marital rights, and that, since, the defendant has conveyed away all the property, and converted the same into money, and that he gave no consideration therefor to her husband, but held it in trust for her husband, and to defeat said wife of her dower in her husband's estate. The answer sets up that he paid full value for the personal property, and denies that the conveyance was made to defraud her. The Court held that " one cannot hold property which he receives as a mere gratuity, or as heir, if the property was so conveyed to him to defeat the wife of the deceased to her right of dower, but he will be held liable in Chancery to account for the property so received, and the widow will be entitled to one-third of such property." And the Court say : " For all which he has paid a full and fair equivalent, he will not be made liable."

A late and satisfactory case on this subject will be found in the 18th volume of Missouri Reports, (by Bennett,) page 390, decided in 1853, and in which the case of Davis vs. Davis, 5 Missouri, was reviewed and re-affirmed, and the case of Lightfoot's Executors vs. Colgin and wife, 5 Munford, 42, considered and weighed, by adopting the opinion of Judge Coalter, the dissenting Judge in that case.

In the case of Stone vs. Stone, the bill alleged that John

C. Stone, her husband, being possessed of the slaves in which she claimed dower, had executed a conveyance of them to the defendant, Jesse F. Stone, in trust, for the use and benefit of the other three defendants, children of said John C. Stone by a former marriage; that said conveyance was executed by her husband in his last sickness, a few days before his death; that, for a long time previous, he had been sick, and was, at the time of executing said conveyance, in a very weak state of body and mind, and, influenced by the persuasions of some of his blood relatives, had made said conveyance for the purpose of defrauding her of her marital rights.

The answer denied that it was executed with a design to defraud the wife of her dower, or under any undue influence. It also appeared that he executed a will about the same time, making provisions for his wife, with which she expressed herself satisfied. It appeared in evidence that Stone, during his last illness, and a short time previous to his death, in consultation with his friends, expressed a desire to secure the slaves to his children by the former marriage, but feared he could not make a conveyance which would defeat his wife's dower; that he was advised that a deed of gift to a trustee, for the benefit of his children, would be effectual for that purpose, and thereupon executed the conveyance. In the opinion of the Court, they say: " Although dower is given in personal estate by our statute, yet it was not thereby intended to restrain the husband's absolute control of it during his life—to give and dispose of as he wills; provided, it be not done in expectation of death, and with a view to defeat the widow's dower. The husband may do as he pleases with his personal property, subject to this restriction. After the enjoyment of the property, in the most absolute manner, during almost his entire life, the law will not permit him, at the approach of death, and with a view to defeat

his wife's right of dower, to give it away. If such a disposition was allowed, the efficacy of the statute, conferring dower *in personalty*, would depend on the whim or caprice of the husband."

Under the statute of Missouri, the widow is entitled to dower in no other personalty than that which belonged to the husband at the time of his death.

In the case of Hays vs. Henry, 1 Maryland Chancery Decisions, the conclusion of the Court was, that if the conveyance be a mere device or contrivance by which the husband, not parting with the absolute dominion over the property during his life, seeks at his death to deny his widow that share of his personal estate which the law would assign to her, then it will be ineffectual against her.

The cases of Tate vs. Tate, 1 Dev. and Batt., (Equity) 22 ; Littleton vs. Littleton, 1 Dev. and Batt., (Law) 327, and McGee vs. McGee, 4 Iredell's, (Law) 327, are cited as showing the decisions of the Court of North Carolina, on the question in this cause. We regret those books are not in the Judicial Library, and we have been unable to obtain them.

On the part of the appellee, the learned counsel rely upon the case of *Lightfoot and others* vs. *Colgin and wife*, 5 Munford, 62, and Cameron vs. Cameron et al., 10 Smedes and Marshall, (Mississippi Reports) page 398.

The case in 5 Munford, was decided in the Court of Appeals of Virginia in January, 1813, and was in substance as follows :

William Lightfoot, the testator, being the owner of a very large real and personal estate, some few months prior to his decease made a settlement upon the children of a former marriage, of the larger portion of his *personal estate*, by deed of trust, in which he reserved to himself a life-interest in the property conveyed. He also made his will about a month afterwards, by which he confirmed the deed of trust, and

then proceeded to provide for his then wife, by giving to her her dower in his real estate and her statutory portion of his personalty which had not been disposed of. The wife, renouncing the provisions of the will, filed her bill to set aside the deed of trust, alleging that the same was made with the express design to *defraud* her of her just proportion of the personal estate.

Judge Coalter dissenting, the following was pronounced as the conclusion of the Court, viz :

" That though a *creditor* might attack the conveyance as fraudulent as to them, yet that in this case of a conveyance between the children of the said William Lightfoot, not shown to be otherwise provided for, and his widow, who is entitled to a large dower in his real estate, besides her share in his personal estate, unconveyed by those deeds, the Court has no power to set aside the said deeds; both because of the meritorious claims of the children as aforesaid—because the widow has no claim of *interest* in the property conveyed by the deeds aforesaid, which will let her in to impeach the same—and because there is no principle authorizing this Court to interfere in this case, which would not equally justify it in setting aside a deed as *fraudulent*, made in favor of children otherwise unprovided for, on the ground of its being VOLUNTARY. The Court is further of opinion, that although the widow of a person dying seized of real and personal estate has a legal, equitable and moral right to a provision from his estate after his death, yet that this claim does not extend to the *whole* thereof—must be limited and defined by law as to the extent and quality thereof, and be in subordination to the claims of creditors and others to whom a preference is given by the positive provisions of the statute."

It is very evident, from the whole scope of this announcement, that the *meritorious consideration* of the deed—it be-

ing made in favor of children otherwise unprovided for, as also the fact that the *widow had a large dower interest in the realty*, and a claim to her portion of the personalty undisposed of by the deed—had more to do in controlling the judgment in this case, than the conclusion that her INTEREST in the property was not such as to give her standing in Court.

Indeed, the very fact that is stated by the Court, as one of the grounds of the judgment, shows conclusively that she did, in that very case, have a *standing in Court;* otherwise, it would have been unnecessary as well as improper to consider any other than her *legal right* to contest the deed. Again: if this case is to be understood as deciding that in no case has a widow such an *interest* in the personal estate of her deceased husband, as will give her a standing in Court to contest any of his dispositions of his personal estate, we are at a loss to comprehend the Court, when it says that "the widow of a person dying seized of real or personal estate has a legal, equitable and moral right to a provision from his estate, after his death." Certainly, if she has a "legal and equitable right," she can only seek her *remedy* by being admitted to a standing in the Courts.

It is also declared, in the opinion of the Court in that case, that the claim of the widow to the personalty is "subordinate to the claims of creditors and others." This is doubtless so under the Virginia statute, but it is otherwise in this State, for the provision of our statute places her in the position of a *preferred* claimant. To admit the position asserted in that case, would be to deprive the widow of any means of contesting a conveyance made under the influence of the *grossest imposition*, and indeed of *duress* itself, for it is only in a Court of Justice that she could effectively impeach the transaction. There seems to be no more *technical* objection to her impeaching the deed of her deceased hus-

12

band for *fraud*, than for an heir or distributee impeaching the will of his ancestor for fraudulent imposition or imbecility. The common law principle in Twine's case, "that if the conveyance was precedent to the right of debt, there is no way to set it aside," and, again, "he who hath a right, title, interest, debt or demand, younger or of later date, shall not avoid a fraudulent gift or estate precedent by the common law," doth not apply to this case of dower, for the reason, here, the question is whether there was a *bona fide* conveyance or not—that is to say, whether he died in "*possession*" of said slaves or not? Her inchoate right to dower, given her by the law, existed at the time of the conveyance, and the right to enjoyment was consummated at the death of her husband, if he has not, by that conveyance, *bona fide* conveyed away his property.

Judge Coalter, in his very able dissenting opinion in that case, remarks: "But it is said the wife is not a creditor, and has no rights against which a fraud can be committed. Might not the same, with equal propriety, be said of a husband before marriage? His right to his intended wife's property is only contingent and inchoate, depending on the subsequent marriage, which may never take place; yet, a *fraud*, it is said, may be committed against that right. The nature of these rights appears to me, therefore, to be very similar; as to those of the husband, they are recognized by our Courts as an *interest* against which a fraud may be committed."

As to this said case of Lightfoot's Executors et al. vs. Colgin and wife, 5 Munford, we—as was said by the Court in Stone vs. Stone, 18 Missouri, 393—incline to the opinion of the dissenting Judge in that case.

The case of Cameron vs. Cameron, 10 Smedes and Marshall, 395, does not at all conflict with the views we have expressed—on the contrary, is rather confirmatory—for it

says the only inquiry in a case of this kind need be, whether the deed of the husband is absolute and irrevocable, or not?—in other words, as we say, whether it is a *bona fide* transaction or not.

Entertaining this view of the law, we now proceed to the inquiry, whether, under the testimony, this bill of sale by Charlton Hines to said William Hines was a *bona fide* transaction or not?

While we admit the law to be as cited by the counsel for the appellee—fraud is never presumed, but always to be proved—yet, it is well established that fraud may be inferred from facts and circumstances, from the character of the contract or from the condition and circumstances of the parties—such as, whether he keeps the bill of sale, or he retains possession of the goods or any part of them, and whether he parts with the absolute dominion over the property during life, and the use he seeks to make of it, &c.

With this chart before us, let us enter upon the testimony.

It appears that on and before the 13th July, 1854, the said Charlton Hines (the grantor) and said William Hines (the grantee) were living in Lowndes county, in the State of Georgia, and that the slaves mentioned in said bill of sale were also there and in possession of said Charlton Hines; that said Charlton and his wife were not then living together; that there were difficulties between them, and that *previous* to July, 1854, the said Charlton Hines, in speaking of his prospect of getting a divorce in Florida, intimated that he did not wish his wife to receive any benefit from anything he had; that this intention of his was so notorious that it became a public rumor; that with this spirit, or *quo animo*, he takes all his negroes, leaving his wife destitute and in Georgia—leaves Georgia and settles in Hamilton county, Florida, in the month of July, 1854; that while in Hamilton county, he, the said Charlton, exercises absolute

dominion over said slaves.    Nothing is heard in Georgia of a sale of them, or a bill of sale of them, to his father.    Nothing is heard of the ownership of them being in any one but Charlton in Hamilton county, until November, 1854, when the witness, Henry M. Stephens, says he purchased Jane and her child from William Hines, and Charlton Hines tells said Stephens that he had made a very good bargain, and that he, Charlton Hines, had owned said slaves, (that is, Jane and Amanda, her child,) but had sold them to William Hines. All seems to have been silent about the bill of sale—nothing heard of it in Hamilton.    The purchase-money derived from the sale of Jane and child finds its way into the pocket of Charlton Hines—part of it in his life-time, and a part after his death, collected in the name of his estate and credited to the estate.    After the sale of Jane and child in Hamilton county, the balance of the negroes continue in the possession of said Charlton Hines, he exercising ownership over them —calling them his own—hires them out—and subsequently cancels the hiring, because he wants to settle a plantation, and takes them with him as he moves into Columbia county, Florida.    In Columbia county, he lives by himself, keeps the negroes to himself, exercises absolute ownership over them, works them, hires them out, and, according to the testimony of C. L. Carruth, Daniel Keitt, James S. Hackney, A. J. Smiley and Joseph K. Haddock, remained in possession of Charlton Hines up to the period of his death.    All this absolute dominion over the slaves by Charlton Hines, must, of necessity, have been known to William Hines; for a part of the time after Charlton moved to Columbia county, the said William Hines lived with his son—afterwards left his son and went to live by himself.    Not one of the witnesses, who were neighbors of both William and Charlton Hines, ever heard that said slaves were not the property of Charlton Hines, until since his death.    All is silent as to

the bill of sale or ownership of William Hines, until after the death of Charlton. Why such privacy? After the death, the artifice comes from its hiding place—the bill of sale now in the hands of the said William Hines, at whose house it appears the said Charlton died—makes its first appearance—written in the hand-writing of Charlton Hines himself—witnessed by a relative, whose testimony is not taken; and although written by Charlton, whom it seems was a magistrate, an intelligent man and acquainted necessarily with the usual forms of such instruments, writes it without the customary word "*delivered*" appearing therein. No record of the bill of sale is ever made in Georgia, Hamilton county, Columbia county, or anywhere else, nor is there any act to give full and complete effect to the transaction. No proof of the payment of any of the consideration money, other than the acknowledgment in the bill of sale. Nothing to show the *bona fide* character of this transaction, other than the simple possession of the bill of sale. The answer of William Hines to the bill of complaint, alleges that the negroes, at the time the bill of sale bears date, to wit: the 13th July, 1854, "*were then and there delivered to, and went into the actual possession of, defendant; and that they have been in his possession and under his control ever since such sale and delivery,*" with a positive denial "*that they were in possession of Charlton Hines at the time of his death, or at any other time since such sale and delivery, except when they were loaned or hired to him.*"

There is not a particle of evidence which sustains the answer. No evidence that said negroes, or any of them, were at any time loaned or hired by the said William Hines to said Charlton Hines. On the contrary, the numerous witnesses examined prove, beyond all question, the continuance of the possession of said slaves in Charlton Hines up to the time of his death, and at all times and on all occasions ex-

298       SUPREME COURT.

Smith and wife vs. Wm. Hines, adm'r—Opinion of Court.

ercising full ownership over them, and that said William Hines acquired possession of them only by virtue of his office as administrator.

After a careful, thorough and patient examination of all the testimony in this case, which develop the facts and circumstances connected with this transaction, we are forced to infer, from those facts, that said Charlton Hines never parted with the absolute dominion over said slaves during his life; and that said conveyance was but a mere device or contrivance, to be used at his death, to keep his widow from her dower. We, therefore, declare it ineffectual against her.

It appears from the testimony that Jane, and her child Amanda, were *bona fide* sold, with the assent of Charlton Hines in his life-time. The said woman Jane, and her child Amanda, will not, therefore, be taken into account in the assignment of dower.

The next question is, whether the Court below was correct in its conclusion that the two negroes, John and Jack, were not included in said bill of sale. The testimony on this branch of the case is very contradictory and unsatisfactory. The confusion may have naturally risen from the varied names so often given to negroes. The question is, are they the negroes embraced in the bill of sale? The name of the negro may be one way of identity, but is not the conclusive way. It appears to this Court that if a Master was directed to inquire into the particular fact, whether these negroes are those mentioned in said bill of sale or not, there could be no difficulty in getting testimony on that point. As the case, under the decision announced, has to be remanded to the Circuit Court, the ends of justice will be best served in having a further reference to the Master to take testimony on this branch of the case.

The remaining question is, whether the Court should have given interest from the date of the Master's report, and not

from the decree? This point was not argued at the hearing before this Court, nor does it seem to have been in the Court below. As the cause is to be remanded, and a new account taken, it will then be the proper time to raise the question, if there is any dispute about it.

It is therefore ordered and adjudged that the decree of the Circuit Court in this cause be *reversed ;* and that said cause be remanded back to the Circuit Court for such other and further proceedings as may become necessary in carrying out the opinion and consideration of this Court.